JUDGE SULLIVAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**12 CIV 6258**

-------------------------------------------------------------------- x

KADEEM SMITH,

                              Plaintiffs,

-against-

THE CITY OF YONKERS, POLICE COMMISSIONER
EDMUND HARTNETT, POLICE OFFICER ROY PILOT,
DETECTIVE MEDINA, POLICE OFFICER PATAKY,
POLICE OFFICER BORRELLI, POLICE OFFICER
TYNDALL, POLICE OFFICER BONIFACHIO, POLICE
OFFICER SAPONARA, JOHN DOE ##1-4

                              Defendants.

**COMPLAINT AND
JURY DEMAND**

ECF CASE

-------------------------------------------------------------------- x

## PRELIMINARY STATEMENT

1.    This is a civil rights action in which plaintiff seeks relief for the violation of his rights secured by 42 USC §1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

2.    The claims arise from an October 22, 2009 incident in which Officers of the Yonkers Police Department ("NYPD"), acting under color of law, intentionally and willfully subjected plaintiff to, among other things, false arrest and excessive force.

3.    Plaintiff seeks monetary damages (special, compensatory, and punitive) against defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

4.    This action is brought pursuant to 28 U.S.C. §1331, 42 U.S.C. §1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

5.    Venue is laid within the United States District Court for the Southern District of New York in that Defendant City of Yonkers is located within, and the events occurred within, the boundaries of the Southern District of New York.

## PARTIES

6.    Plaintiff is a citizen of the United States and at all times here relevant resided in Yonkers, New York.

7.    The City of Yonkers is a municipal corporation organized under the laws of the State of New York.

8.    Police Commissioner Edmund Hartnett at all times relevant was the Police Commissioner of the Yonkers Police Department ("YPD"). He was personally involved in crafting the policies of the YPD, including the policies referenced below, and is sued in his personal and official capacity.

9.    All others named individual defendants ("the officers") are employees of the YPD, and were personally involved in the arrest complained of in this complaint.

10.    John Doe ##1-4 are YPD supervisors, who were directly responsible for supervising and training the officers in this case.

11.    At all times here mentioned defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of New York, and City of Yonkers.

## FACTUAL ALLEGATIONS

12.    On October 22, 2009, plaintiff was approached by police officers outside of the school he had attended. The officers suspected plaintiff of trespassing at a school where he was a student.

2

13.   The officers searched plaintiff and found no contraband on him.  Nevertheless, they took out handcuffs and began to arrest him.  Plaintiff then fled from the police.

14.   Plaintiff was found hiding by one of the officers nearby, in the woods.  The officer hit plaintiff in the head with a gun, hard enough to inflict a wound that required four staples to close.

15.   Although plaintiff did not resist in any way but the initial flight from the officers, and was under the control of the officers from the moment he was found in the woods, the other officers joined the first officer in assaulting plaintiff.  Officer Roy Pilot then released a police canine to bite plaintiff.  Although properly trained canines are trained (at worst) to "bite and hold" to assist an apprehension- that is, to grasp a suspect with its jaw and not let go, the canine that was set loose upon plaintiff bit plaintiff repeatedly all over his body, causing severe, and unnecessary suffering.

16.   In fact, the canine was deliberately put into such a frenzy that it bit one of the officers.

17.   As the assault by the officers and the canine continued, one of the officers shouted "stop, you're killing him".  The assault by the officers ended, and plaintiff was taken into custody.

18.   Plaintiff was injured all over his body as a result of the dog bites and the officers' blows.

19.   No investigation was ever conducted as to how plaintiff was injured so badly in the course of the arrest, despite the obvious and excessive injuries.  In fact, plaintiff was never interviewed by any officer concerning what had occurred, despite the fact that, at the very least, it was apparent that the canine had not performed according to proper police canine procedures, and training, based at the very least on the undisputed fact (appearing in the criminal court complaint against plaintiff) that the canine had bitten one of the officers.

20.    Only four months earlier, in June, 2009, the United States Department of Justice issued

an interim report on investigations it had been conducting into the practices of the YPD for

almost two years ("the DOJ report").   It is appended to this complaint and incorporated by

reference.   The report recommended the YPD revise and clarify its use of force policies, to

include "guidance on the appropriate level of force allowed in specific circumstances" and

"detailed use of force reporting", as "lack of specific policy guidance on the appropriate use of

force may lead officers to believe that they are justified in using force in situations in which such

force would be unreasonable or unnecessary."

21.    The DOJ report further specifically addressed the YPD's use of canine force, criticizing

the YPD's policies and lack of clarity with respect to the use of canine force, particularly related

to misdemeanor suspects, and its policy "regarding the reporting and investigation of canine

bites", since "...a bite is a use of force (and a potentially serious one)".   The mayor of Yonkers

responded that the report stemmed from "as assumption of guilt", and suggested there was no

"systemic problem".   No meaningful reforms to the use of force or canine policies were enacted

between the issuance of the DOJ report and the incidents here complained of.


## DAMAGES

22.   As a direct and proximate result of the acts of defendants, plaintiff suffered the

following injuries and damages:

      a.       Violation of his rights pursuant to the Fourth and Fourteenth Amendments to the

      United States Constitution to be free from an unreasonable search and seizure;

      b.       Violation of his right to Due Process of Law under the Fourteenth Amendment to

      the United Stated Constitution;

4

c.    Physical and emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, anxiety;

## FIRST CAUSE OF ACTION
(42 U.S.C. § 1983)

23.   The above paragraphs are here incorporated by reference.

24.   Defendants acted under color of law and conspired to deprive plaintiff of his civil, constitutional and statutory rights to be free from unreasonable search and seizure and to due process of law pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, and are liable to plaintiff under 42 U.S.C. §1983.

25.   Defendants used excessive force in arresting plaintiff, and failed to intervene in each other's obviously illegal actions.

26.   Plaintiff has been damaged as a result of defendants' wrongful acts.

## SECOND CAUSE OF ACTION
(MUNICIPAL AND SUPERVISORY LIABILITY)

27.   The above paragraphs are here incorporated by reference.

28.   The YPD, Police Commissioner Edmund Harknett, and John Doe ##1-4 are liable for the damages suffered by plaintiff in that, after learning of their employees' and supervisees' violation of plaintiff's constitutional rights, they failed to remedy the wrong; they created and maintained policies and customs under which unconstitutional practices occurred and allowed such policies or customs to continue, and they were grossly negligent in managing subordinates who caused the unlawful conditions and events.

29.   The City of Yonkers, Police Commissioner Harknett, and John Doe ##1-4 knew to a moral certainty that police officers would encounter situations where they had to determine the correct level of force to use; such situations presented the officers with a difficult choice, the

kind which training would make less difficult, and there was a history of employees mishandling the situation, and the wrong choice by police officers frequently resulted in the deprivation of citizens' constitutional rights.   Nevertheless, The City of Yonkers, Police Commissioner Harknett, and John Doe ##1-4 failed to clarify or promulgate appropriate policies relating to use of police force and particularly use of canine force.

30.   The City of Yonkers, Police Commissioner Harknett, and John Doe ##1-4 have demonstrated a deliberate indifference to the constitutional rights of the citizens of Yonkers, and plaintiff has been damaged as a result.


WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, as follows:

A.   In favor of plaintiff in an amount to be determined by a jury for each of plaintiff's causes of action;

B.   Awarding plaintiff punitive damages in an amount to be determined by a jury;

C.   Awarding plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

D.   Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:     Brooklyn, New York
            August 11, 2012

Very truly yours,

Stoll Glickman & Bellina, LLP
By: Andrew B. Stoll (AS8808)
Attorney for Plaintiff
475 Atlantic Avenue
Brooklyn, NY 11217
(718) 852-3710
astoll@stollglickman.com

# EXHIBIT A



**U.S. Department of Justice**

Civil Rights Division

*Special Litigation Section - PHB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

June 9, 2009

**BY FACSIMILE AND FIRST CLASS MAIL**

Raymond P. Fitzpatrick, Jr., Esq.
Fitzpatrick & Brown, LLP
1929 Third Avenue North, Suite 600
Birmingham, AL 35203

Re: Investigation of the Yonkers Police Department

Dear Mr. Fitzpatrick:

As you know, the Special Litigation Section of the Civil Rights Division of the United States Department of Justice, with the United States Attorney's Office for the Southern District of New York, is conducting a civil investigation of the Yonkers, New York Police Department ("YPD"), pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 and the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d. We would like to express our appreciation for the cooperation that we have received thus far from the City of Yonkers ("City") and the YPD. In this letter, we convey recommendations regarding YPD's policies.

To date, we and our consultants have reviewed relevant policies and procedures, interviewed City officials, interviewed a cross-section of YPD supervisors and patrol officers, and participated in ride alongs with YPD personnel. We also met with representatives of the Yonkers Police Benevolent Association; representatives of the Yonkers Police Captains, Lieutenants, and Sergeants Association; local community leaders; and citizens. Our issues and concerns regarding YPD's policies are noted herein and primarily focus on the following areas: the content, organization and overall structure of the YPD Policy and Procedure Manual (the "Manual"); use of force policies and procedures; investigation of citizen complaints; supervisory

- 2 -

oversight structure; training program and materials; community relations; and personnel issues. Where applicable, we have provided recommendations. In addition to the recommendations conveyed herein, we would also be able to provide examples of policies used by other police departments that might address some of the issues we raise below, as well as to review any additional VPD policy revisions drafted by the VPD in response to this letter.

Our review process is ongoing and we hope to conclude the process shortly. Important aspects of our investigation remain outstanding, however, most notably our review of documents related to specific use of force incidents. Therefore, this letter is not meant to be exhaustive, but rather focuses on significant concerns we can convey based on our review thus far of the VPD's policies and procedures, training curricula, and our observations of officers in the field. Please note that we may identify additional issues as our investigation progresses. This letter is therefore preliminary in nature and does not reach any conclusion regarding any potential violations of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 and the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d.[1]

## I.   Overall Content and Structure of VPD Policies and Procedures Manual

Policies and procedures are the primary means by which police departments communicate their standards and expectations. Thus, policies and procedures should be current, accessible to all officers, and consistent with relevant legal standards and contemporary police practices.

Prior to our tour, the VPD provided us with its Manual. At the time of our visit, the VPD indicated that it was already in the process of reviewing and revising its Manual. VPD's decision to review and revise its Manual is an important and noteworthy step. We make the recommendations herein to assist the VPD in the essential task of reviewing, updating, and maintaining its Manual.

_____

[1]    We view the technical assistance provided herein as recommendations and not mandates. These recommendations were developed in close consultation with our police practices consultants. We strongly urge the VPD to consider these technical assistance recommendations in revising its policies and procedures.

- 3 -

A review of the Manual indicates that many sections are outdated and not very well organized. In fact, although the table of contents indicates that the Manual is current as of December 2005, many of the policies we reviewed had not been updated since the early      . For example, Policy 1.06.03, regarding the Police Professional Standards Review Committee, has an effective date of January 4, 1993. That policy does not appear to have been updated since 1993. Further, that same policy has a random and non-sequential set of numbering for each paragraph within the policy, leaving the impression that the policy was created by "cutting and pasting" a number of requirements together without any overall organization or editing prior to publication. Presentation of a policy in such a disorganized manner is an ineffective means to convey necessary information.

In addition, the overall size and structure of the Manual makes its use as a reference guide impractical for the average officer. Specifically, the Manual appears to combine policies, training materials, and technical information in one location, resulting in a voluminous Manual without any differentiation between the various topics. Further, as discussed in more detail below, the Manual does not provide any cross-references between policies that would make the Manual more accessible.

We recommend that the YPD update and reorganize its Manual to make it current and more user friendly. We also recommend that the YPD distribute updated and complete policies and procedures to all officers and that all officers provide a written acknowledgment of their receipt, review, and understanding of the policies and procedures. We also suggest that the YPD designate an individual to be responsible for reviewing the Manual, and any revisions or new policies, to ensure consistency. This individual would also be responsible for ensuring that all officers receive copies of the Manual and revisions thereto, by maintaining copies of officers' signed acknowledgments.

## II.  **Use of Force Policies**

In the course of their duties, police officers are sometimes required to use deadly and less than lethal force. Because the use of force can place officers, civilians, and subjects at serious risk of harm, it is incumbent upon law enforcement agencies to ensure that officers use force appropriately. Policies and procedures must clearly set forth the legal standards for the appropriate use of force. We recommend that the YPD revise its use of force policies to provide a comprehensive policy that contains the following elements:

appropriate definitions, a use of force continuum (including intermediate weapons), guidance on the appropriate level of force allowed in specific circumstances, and detailed use of force reporting.

## A.   Legal Standards Governing Use of Force

Use of excessive force by police officers violates the Fourth Amendment, as analyzed under the objective reasonableness standard articulated in Graham v. Connor, 490 U.S. 386, 394 (1989). The analysis requires a balancing of the quality of intrusion on the individual's Fourth Amendment interests against the governmental interests. Id. at 396. Uses of excessive force by police officers in the course of arrest, investigatory stop, or other seizure are violations of the Fourth Amendment.² The

---

² A seizure -- i.e., by means of physical force or show of authority -- is the event that triggers Fourth Amendment protections. See Graham, 490 U.S. at 395, n.10; Papineau v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006). The Second Circuit has consistently held that claims of excessive force by law enforcement in the course of a seizure should be analyzed under the Fourth Amendment's reasonableness standard rather than a Fourteenth Amendment substantive due process approach. See Hemphill v. Schott, 141 F.3d 412, 418 (2d Cir. 1998)(citing Graham, 490 U.S. at 394); see also Nimely v. City of New York, 414 F.3d 381, 390 n.7 (2d Cir. 2005) ("excessive force used by officers arresting suspects implicates the Fourth Amendment's prohibition on unreasonable seizures, rather than the Fourteenth Amendment's guarantee of substantive due process")(citing Graham, 490 U.S. at 394-395, "excessive force claims must be analyzed under the rubric of the constitutional right that is most directly implicated by the facts giving rise to the claim"); Tenenbaum v. Williams, 193 F.3d 581, 599-600 (2d Cir. 1999) (citing Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting Graham, 490 U.S. at 395)). The Constitution, however, affords Fourteenth Amendment Substantive Due Process protection from physical abuse by police officers for claims that are not susceptible to proper analysis under a different specific constitutional right -- e.g., an excessive force claim without a seizure to trigger a Fourth Amendment analysis. See Hemphill, 141 F.3d at 418 (citing Rodriquez v. Phillips, 66 F.3d 470, 477 (2d Cir. 1995) ("in the non-seizure, non-prisoner context, the substantive due process right to be free from excessive force is alive and well.")). Similarly, once an arrestee becomes a pre-trial detainee, Fifth and Fourteenth Amendment Due Process protections, rather than the Fourth Amendment, are the appropriate constitutional basis for excessive force claims. See

criteria courts apply to assess an excessive force claim include
the severity of the crime at issue, whether the suspect presents
an immediate safety threat to the officers or others, and whether
the suspect is actively resisting or attempting to evade arrest.
Id.; Sullivan v. Gaugnier, 225 F.3d 161, 165 (2d Cir. 2000).
Lack of specific policy guidance on the appropriate use of force
may lead officers to believe that they are justified in using
force in situations in which such force would be unreasonable or
unnecessary. Conversely, overly specific policies may result in
officers refraining from using necessary and appropriate force
out of an unwarranted fear of using excessive force.

The Supreme Court has determined that deadly force is
permissible only when a suspect poses an immediate threat of
serious physical harm to the officer or another person.
Tennessee v. Garner, 471 U.S. 1, 11-12 (1985). The only
exception to this general rule is the "fleeing felon" rule, which
allows police officers to use deadly force to prevent the escape
of a suspect in cases where there is probable cause to believe
the suspect either poses an immediate threat of serious harm to
the officer or another, or has committed a crime involving the
infliction or threatened infliction of serious physical harm.
Id.; Davis v. Little, 851 F.2d 605, 608 (2d Cir. 1988). Yet even
in those circumstances, police are required to provide a warning,
if feasible, before using deadly force. Garner, 471 U.S. at 11.
Deadly force is permissible only for as long as the threat
remains. When the threat is over, officers must cease using
deadly force.

Although our jurisdiction is, of course, limited to federal
law, we recommend that the YPD's use of force policy be revised
to track both the federal constitutional and state standards.[3]
New York has its own statute covering the situations in which law

───────────────

Nimely, 414 F.3d at 390 n.7 (citing Brown v. Doe, 2 F.3d 1236,
1242 n. 1 (2d Cir. 1993)); United States v. Walsh, 194 F.3d 37,
47 (2d Cir. 1999) (citing Bell v. Wolfish, 441 U.S. 520, 535
(1979)).

[3]    We note that differences between state and federal law
should be explained to prevent confusion, and that the YPD should
be explicit about whether it is mandating a more stringent
standard than required by the law. For example, the Washington
D.C. Metropolitan Police Department adopted a use of force policy
which prohibited the use of chokeholds, although they were
generally allowable as a matter of law in instances where deadly
force was appropriate.

- 9 -

enforcement agents may employ deadly force.  Specifically, McKinney's Penal Law § 35.30 provides in relevant part:

. . . deadly physical force may be used for such purposes only when [the officer] reasonably believes that:

(a)  The offense committed by such person was: (i) a felony or an attempt to commit a felony involving the use or attempted use or threatened imminent use of physical force against a person; or (ii) kidnapping, arson, escape in the first degree, burglary in the first degree or any attempt to commit such a crime; or

(b) The offense committed or attempted by such person was a felony and that, in the course of resisting arrest therefore or attempting to escape from custody, such person is armed with a firearm or deadly weapon; or

(c) Regardless of the particular offense which is the subject of the arrest or attempted escape, the use of deadly physical force is necessary to defend the police officer or peace officer or another person from what the officer reasonably believes to be the use or imminent use of deadly physical force.

We note that the Manual does not address legal standards governing the use of force.  We recommend that the Manual be reviewed to address applicable legal standards  to provide officers with a framework for making appropriate use of force decisions.

### B.   Use of Force Definitions

YPD should provide officers with clearly written policies that establish guidelines for the use of force, including appropriate limitations on the use of deadly and less than lethal force, and prohibitions on the use of unauthorized types of force.  An essential component to a clearly written use of force policy is a definition of deadly and less than lethal force.  The YPD does not have a central use of force policy that provides a comprehensive list of actions that are considered uses of force. Instead, YPD's use of force policy is fragmented among separate, individual, use of force policies for separate use of force tools, such as the Use of Heckler & Koch MP-5 or the Use of Oleoresin Capsium ("OC") Spray policies.  See Policy 1.08.06; 1.09.03.  Further, these individual use of force policies are not arranged in any organized and coordinated format vis-a-vis deadly and less than lethal force.  For example, the use of a shotgun

- 7 -

and the use of the Heckler & Koch MP 5, both of which can be deadly, are not addressed in Policy 1.09.01, under Use of Deadly Force; rather, they are addressed in Policy 1.08.08. We recommend that the YPD consider reorganizing all individual use of force policies into a comprehensive, single use of force policy as appropriate.

Currently, in order for a YPD officer to grasp the YPD's requirements for use of force, the officer must read several different policies and extrapolate from those policies the YPD's definition of use of force and what constitutes permissible and impermissible uses of force. Policy 1.09.05 best illustrates this problem. Policy 1.09.05 is entitled "Use of Force Restrictions"; however, the text of the policy is limited. Indeed, the policy incorporates New York State law, Article 35, by reference, but does not go into detail as to how Article 35 is applied. Policy 1.09.05 requires an officer to research Article 35, rather than provides the language and guidance on its application, and offer situational examples. Therefore, we recommend that the YPD establish a use of force policy that defines when the use of force is permissible and provides clear definitions and operational guidance on the use of deadly and less than lethal force.[4]

Moreover, the term "use" is inconsistently applied. Compare, for example, Policy 1.08.01, Use of Shotgun, with Policy 1.08.06, Use of Heckler & Koch MP-5. The term "use" carries a different meaning for both policies. The term "use" in 1.08.01 relates to the care and maintenance of the shotgun rather than application and use. By contrast, the term "use" in 1.08.06 refers to the actual application of the Heckler & Koch MP-5 not not care. The inconsistency may be confusing to officers who are looking to the policy for guidance on when it is appropriate and permissible to use a weapon, such as the shotgun, in a specific situation. Thus, we recommend that the YPD select different terminology when referring to the care and maintenance of a weapon vis-a-vis its actual use. We reiterate our recommendation noted above that the YPD consider separating technical information that refers to the care and maintenance of weapons, as well as training materials relating to weapons, from a use of force policy.

---

[4]     For example, Prince George's County, Maryland Police Department defines "use of force" as any physical coercion used to effect, influence or persuade an individual to comply with an order from an officer.

- 8 -

### 1.  Less Than Lethal Force

YPD's force-related policies fail to fully address what constitutes less than lethal force.  Although there are various policies that address the use of a specific weapon, there is no policy that specifically defines permissible use of force and delineates permissible uses of force.  Because YPD officers should be fully informed of the actions that may constitute a use of force, we recommend that the YPD's use of force policy provide a comprehensive list of actions that are considered uses of force, including physical force.  These examples should include actions such as takedowns and firearm brandishing.  In addition, we recommend that the YPD's use of force policy identify any uses of force that are prohibited or restricted to limited circumstances (e.g., chokeholds).

### 2.  Deadly Force

YPD's force-related policies also inadequately address "deadly force."  Specifically, YPD's deadly force policy does not define deadly force.  See Policy 1.09.01.  The policy addresses the topic of deadly force, but there is no specific departmental definition for what constitutes deadly force.  The YPD's deadly force policy is fragmented and an officer reading the policy must extrapolate from several provisions in order to create a definition of deadly force.  Such extrapolation is dangerous, as the YPD has no control over what an officer subjectively believes is deadly force.  Accordingly, we strongly recommend that the YPD adopt a uniform definition of deadly force.[5]

Moreover, the deadly force policy contains vague language and undefined terms.  For example, the policy states:

> "[a] police officer is authorized and has a duty to prevent an attack with deadly force upon himself, a fellow officer or member of the public, by utilizing whatever force is necessary, including the use of a firearm."

See Policy 1.09.01.III.A. (emphasis added).  The policy should delineate the appropriate uses of force rather than suggest an indiscriminate application of force.  The term "whatever" may

---

[5]    For example, many police departments define deadly force as that force which could result in a substantial risk of death or serious bodily injury.

- 9 -

suggest that an officer has the authority to use both authorized
and unauthorized uses of force to quell a dangerous situation and
may allow for unconstitutional applications of force.

Further, according to the policy, an officer may discharge
his firearm under specific circumstances: in "Confrontation
Situations" and "Apprehension and Pursuit Situations." See
Policy 1.09.01.III.A.1-2. The language in this section of the
policy is similarly vague and may lead officers to believe they
are justified in using force in situations in which the force
would be unreasonable. For example, Policy 1.09.01.III.A.1-2
provides that an officer may discharge his firearm:

   a.    To defend himself or other persons from death or
         serious bodily harm; or

   b.    To prevent or terminate the commission of a robbery
         or kidnapping, including the taking of hostages,
         when there are no other reasonable means available
         to prevent or terminate such offenses.

See Policy 1.09.01.III.A.1.a-b. First, the term "reasonable" in
subsection (b) is not defined. Second, the language depends
heavily on interpretation rather than offering objective
situations and scenarios. For example, subsection (b) suggests
that if an officer determines that a subject was about to commit
a robbery or kidnapping, then deadly force is per se permissible.
This is a dangerous proposition, because subsection (b) does not
specify whether or not the subject is armed. Moreover,
subsection (b) does not allow for alternatives to deadly force,
such as verbal commands, if appropriate and safe. As written,
the policy suggests that an officer who sees a subject attempting
to rob or kidnap, or is in the process of robbing or kidnaping an
individual, may use deadly force. Such interpretation does not
allow for de-escalation techniques to neutralize the situation
without having to resort to deadly force. Moreover, allowing for
the indiscriminate application of force conflicts with the
imminent harm requirement of subsection (a). Subsection (a)
allows force where there is imminent harm; however, subsection
(b) is broader and, as written, may nullify subsection (a). We
also note that the arbitrary selection of specific crimes (i.e.,
robbery and kidnapping) may not be a helpful guideline for
officers as the selection implies that only those crimes warrant
deadly force.

The YPD's deadly force policy also does not adequately
identify the types of force that constitute deadly force (except
for the use of a firearm). YPD's deadly force policy fails to

- 10 -

indicate that a strike to the head with an impact weapon, including a police radio or flashlight, is an application of deadly force. Similarly, the policy fails to identify uses of physical force which may constitute deadly force, such as the application of a chokehold.[9] We thus recommend that the YPD include in its definition of deadly force any use of force that is likely to cause death or serious bodily injury. Similarly, we recommend that the YPD's use of force policy limit strikes to the head with impact weapons, such as batons or flashlights, as tactics of last resort to be used only when the use of deadly force would otherwise be authorized. Lastly, we recommend that the revised policy identify uses of physical force that may constitute deadly force.

Moreover, the deadly force policy does not reference seminal federal and state case and statutory law, including Graham and, as noted, New York State Article 35. Similarly, there is no reference to the YPD's overall mission and value to preserving the life of its officers and members of the community. Instead, the background section to the Use of Deadly Force Policy emphasizes "unwavering support" by the YPD to officers "when they act in a reasonable and prudent manner within the framework of State Law and Department Policy." Policy 1.09.01.II. Yet no guidance on what is "reasonable," and "prudent," is provided, nor are there any explicit guidelines of what "State Law" and "Department Policy" are being referenced. Lastly, the deadly force policy, effective as of July 1, 1996, is outdated and should be revised to comport with other provisions of the YPD policies and procedures and contemporary police practices.

Given the above, we recommend that the revised deadly force policy clearly and accurately define all terms, including reasonable force (e.g., the minimum amount of force necessary to effect the arrest or protect the officer or other person). We further recommend that the YPD clarify its deadly force policy, explicitly limiting the use of deadly force to situations involving an imminent threat of death or serious physical injury to an officer or other person. The revised policy should also identify all uses of force that constitute deadly force.

[9] During our on-site interviews, YPD officials assured us that YPD prohibits the use of chokeholds. Nevertheless, we were unable to locate such a prohibition in the Manual.

C.   **Use of Force Continuum**

A use of force continuum is central to a comprehensive use
of force policy.[7]  When properly designed and implemented, a use
of force continuum is a fluid and flexible policy guide.  Many
departments employ the continuum because it provides a useful
tool in training officers to consider lower levels of force, when
appropriate, which protects the safety of both the officer and
the civilian.  Moreover, a use of force continuum can emphasize
that officers' presence, verbal commands, de-escalation
strategies, and the use of "soft hands" techniques (using hands
to escort rather than control subjects) be used as alternatives
to more significant uses of force.

The Manual does not include a use of force continuum that
encompasses all authorized weapons available to the YPD.
Instead, references to elements of a use of force continuum are
widely dispersed in the voluminous Manual, limited to one
specific weapon, and characterized as training information,
guidelines, or recommendations, but not policy.  Policy 1.09.02,
addressing the Use of the Straight and PR-24 Type Police Baton,
best illustrates this problem.  Rather than setting forth a
policy, this section sets forth "General Training Guidelines
Reminders."  Policy 1.09.02.V.  As part of training, the Manual
reminds officers to use the minimum amount of force necessary
when using a baton, and suggests that the officer consider only
the following prior to using a baton:

1.    Whether other officers at the scene can provide
      assistance to subdue the subject;

2.    The feasibility of summoning backup assistance; and

3.    The feasibility of using chemical agents.

Policy 1.09.02.V.  There is no policy, nor even a suggestion, of
using less force (if appropriate).  The section then states that
when use of the police baton is "justified," -- without setting
forth a policy on justified use -- then the officer should
deliver "short and snappy" blows to "vulnerable areas of the body
which will render the subject temporarily incapacitated but are
not likely to cause serious physical injury."  Finally, the

---

[7]     A use of force continuum is a guide which attempts to
rank uses of force, ranging from de-escalation techniques to
deadly force, which an officer may employ to gain control and
compliance of a suspect in an appropriate and justified manner.

- 12 -

Policy references a coded chart highlighting "the appropriate target of choice," without any policy on what is an "appropriate" target.

Although YPD officers may carry a variety of weapons, ranging from OC spray and PR-24 baton to service firearms, the YPD's policies do not guide officers on when to use each weapon in relation to other choices.[8] We thus recommend that the YPD's force policy include a use of force continuum describing how the various force options may be used, how the various applications of the options affect their placement in the use of force progression, and what level of force is appropriate in response to suspects' resistance. The continuum should include all types of force the YPD authorizes for use (e.g., canine, OC spray, PR-24).

Because officers are often confronted with difficult use of force decisions with respect to persons with mental illness or who are under the influence of drugs or alcohol, we also recommend that the YPD's use of force policy and force continuum include the de-escalation techniques appropriate to interactions with such persons.[9]

In sum, the Manual should be revised to include a use of force continuum that applies to all uses of force.

---

[8]   For example, Policy 1.09.03 indicates that OC spray should be used at a "level less than that of a firearm, but greater than the application of ordinary physical force." This paragraph may confuse officers regarding appropriate situations for deploying OC spray rather than using a PR-24 baton (although Policy 1.09.03 regarding the PR-24 may clarify such a discrepancy, a single force continuum containing all force options will ensure consistency of appropriate use).

[9]   Although we understand that YPD officers are already trained to identify persons with mental illness, or who are under the influence of drugs and/or alcohol, we recommend that the YPD establish a working relationship with the local public mental health provider, as well as organizations providing assistance with substance abuse, as an added resource for training and support when faced with individuals with mental illness or who are under the influence. A good model for a successful police and mental health services partnership is one used by the Cincinnati Police Department.

- 13 -

D.   **Specific Uses of Force**

We have reviewed the YPD's use of force policies regarding specific uses of force and have the following comments:

1.   **Firearms**

The YPD policies fail to provide clear guidance and comprehensive procedures regarding the use of firearms.  Indeed, while Policies 1.08.02 through 1.08.04 define the YPD authorized firearms and Policy 1.09.01 references the discharge of firearms as it relates to deadly force, there is no policy regarding brandishing a weapon or specifying procedures following deadly force situations (including procedures for reporting and documenting firearm discharge).  We recommend that the YPD develop a clear policy for the authorized use of firearms, including clearly delineating appropriate and inappropriate uses. We further recommend that the YPD consolidate its various firearm policies into one policy providing clear guidance and comprehensive procedures regarding the use of firearms.

We additionally note that the policies on Authorized Personal Firearms, Policy 1.08.02, and Authorized Ammunition, Policy 1.08.03, seem outdated, leaving the impression that neither has been updated since its effective date of October 13, 1993, and September 14, 1993, respectively.  For example, it can be inferred from Policy 1.08.02, that "Uniformed Duty Officers" will carry both a double action revolver, as well as a 9mm double action semi-automatic pistol, thus leaving to doubt whether an officer must carry a revolver, a semi-automatic pistol, or has another option.  Policy 1.08.02.III.A.1-2.  Thus, YPD's gun issuance policy should be revised to precisely reflect its current policy on department issued weapons.

2.   **Use of Shotguns**

The Manual acknowledges "the lethal potential of the shotgun's wide shot dispersion pattern."  Policy 1.08.01.II. Yet, as noted above, the Manual does not address the use of shotguns in the context of deadly force.  See, supra, Section II.B.  Moreover, the Manual does not set forth a clear policy on when the discharge of a shotgun is justified.  Rather, the focus of the policy is on the handling and carrying of shotguns. Accordingly, we recommend that the YPD develop a clear policy for the authorized deployment of shotguns, and that such policy address legal standards on use of force, as well as its placement on a use of force continuum.

### 3.   Use of the Heckler & Koch MP-5

As with shotguns, we recommend that any use of the Heckler &
Koch MP-5 be addressed in the context of deadly force. The
policy, as written, acknowledges the inherent danger of this
weapon and limits its use to the Emergency Services Unit and
selected supervisors of the Special Operations Division. Policy
1.08.06.II. Although restricting the use of the Heckler & Koch
MP-5 to specific personnel is advisable, we note that the policy
does not set forth the criteria for the selection of supervisors
who are authorized to use the Heckler & Koch MP-5, nor does it
provide any cross-reference to the Emergency Services Unit or
Special Operations Division and the types of situations in which
the use of the Heckler & Koch MP-5 by these units would be
reasonable.

Thus, we encourage the YPD to expressly set forth the
criteria to be used for the selection of supervisors who are
authorized to use the Heckler & Koch MP-5, as well when such use
would be reasonable. We also encourage the YPD to review its
entire use of force policy with respect to all firearms to
address the fragmented nature of its policy, as well as
streamline and differentiate policy from training, maintenance,
and care of firearms.

### 4.   OC Spray

While Policy 1.09.03, addressing use of OC spray, is
generally adequate in content, we recommend that when practical,
the YPD require officers to make all attempts to warn subjects
prior to deploying OC spray. In addition, while the YPD's OC
policy indicates that OC spray "is most effective when a well-
aimed one second burst is directed at the face of an aggressor
from a range of ten feet or less," we recommend that the policy
also set a threshold number of bursts and distance within which
OC spray may only be used in exigent circumstances.

### 5.   The Straight and PR-24 Type Police Baton

The Manual acknowledges that police batons are defined as
"deadly weapons" under the New York State Penal Law. Policy
1.09.02.II. This policy references a use of force continuum
indicating that use of a baton is regarded "as an escalation in
the use of force to a level greater than the application of
chemical agents and physical force but less than the use of a
firearm." _Id._ This policy also references Article 35 of the New
York State Penal Law; however, as noted below, those legal
standards are not set forth in the Manual, nor is a use of force

- 15 -

continuum presented as a specific policy requirement.

Policy 1.09.02, regarding use of the straight baton and the PR-24 baton, indicates that "improper or unreasonable" use of the baton may cause serious physical injury or death. This policy contains a color-coded diagram of the human body divided into three levels of trauma (highest, moderate, and caution) caused by baton strikes. While the policy cautions that misuse of the baton could result in serious injury or death, the policy does not indicate when such use would be appropriate. We recommend that the YPD further detail the policy to clarify that blows capable of inflicting permanent injury must be avoided unless the officer is confronted with a situation in which the use of deadly force would be authorized. Moreover, we recommend that the YPD specifically identify strikes to the head as blows capable of inflicting permanent or deadly injury.

Further, the policy contains vague references as to when use of the police baton is warranted, such as to "subdue a violently resisting subject" or an "uncooperative subject in custody." Policy 1.09.02.IV.B.1,5. Neither of these terms are defined, and no effort is made to distinguish between armed and unarmed subjects. We also note that the policy states that officers are "reminded that the force used must be reasonable for the circumstances encountered." See id. Once again, as there is no express use of force definition in the policy, nor any legal standards explaining the term "reasonable," it remains unclear how an officer will be able to properly determine when it is objectively reasonable to use a potentially deadly impact weapon such as a police baton.

The section of the policy on use of the police baton also combines reporting requirements and training materials. YPD should consolidate all use of force reporting requirements - regardless of the weapon - and separate training materials from policy.

### 6.   Canine Deployment

While the YPD's canine policy, Policy 2.03.03, does not identify the YPD's canine handling methodology,[10] we were informed during our interviews with YPD personnel that the YPD employs a

---

[10]    The canine handling methodology refers to the use of a dog to search for and apprehend a suspect, including the commands used by the handler to hold the suspect at bay (i.e., "guard and bite"; "find and bite"; "find and bark").

"find and bite" policy. Generally accepted police practice for canine use of force, however, calls for a "find and bark" methodology. We recommend that the existing canine policy and all related policies be revised to reflect this methodology. A "find and bark" policy prevents canines from biting subjects in situations in which such force is not necessary to effect an arrest or protect the safety of officers or civilians, such as where a subject is passively hiding in a building. This policy also allows for the canine handler, not the dog, to be in charge of controlling the application of force.

Moreover, YPD policy does not sufficiently articulate the circumstances in which canine use of force is permitted. For example, the policy allows officers to use canines in order to "effect the arrest or prevent the escape of a person whom the police officer has reasonable grounds to believe has committed a crime, as long as the force used is reasonable under the circumstances." See Policy 2.03.03.III.A.3.a. This policy raises two issues. First, it does not define what type of "crime" warrants the use of canines (i.e., because use of a canine or a canine bite is such a high level use of force, it likely would be inappropriate to deploy a canine to apprehend an unarmed suspect for petty theft). While we were informed that the YPD teaches canine officers that canines may be used only in the context of felonies, we urge the YPD to amend its policy to reflect that limitation. Second, the policy does not define when force is problematic given the YPD's use of a "find and bite" policy and the absence in the YPD policy of both a definition of "reasonable" use of force as well as a use of force continuum.

Moreover, while the YPD policy is silent as to who may authorize the use of a canine, we were informed that the decision to deploy a canine is left to the handler in the absence of an Emergency Services Unit supervisor. We recommend that YPD policy require canine handlers to have approval from a supervisor before a canine can be deployed, except in extraordinary circumstances where time does not allow for the securing of such approval. When a canine supervisor cannot be located, the canine handler should seek approval from another supervisor.

The YPD appropriately forbids the use of canines for "crowd control" at demonstrations, strikes, or peaceful gatherings. See Policy 2.03.03.III.A.3.g. Nevertheless, we note that the policy appears inconsistent because it permits the use of canines to "assist at the scene of public dem[o]nstrations or other violent situations where the presence of a canine team would effectively contribute to the maintenance or restoration of the

- 16 -

- 17 -

peace." See id. To correct this inconsistency, we recommend
that the YPD streamline the policy by prohibiting the use of
canines as a deterrent to protect property only. We also
recommend a prohibition on the use of canines in riots, potential
riot conditions, or other large assemblies. In light of the
diversity of the Yonkers community, we also recommend that any
warnings issued to individuals prior to the deployment of the K-9
Unit be issued in Spanish, as well as in English.

Finally, we recommend that the YPD amend its policy
regarding the reporting and investigation of canine bites.
Currently, YPD policy limits review to an on-scene investigation
by a supervisor. See, e.g., Policy 2.03.03.III.D.3. Because a
bite is a use of force (and a potentially serious one), the
protocol for investigating and evaluating bites should track the
protocol employed by the YPD for serious use of force incidents.
See, infra, Section II.E.

## E.   Use of Force Reporting

The routine supervisory review of officer uses of force is
critical to a department's ability to ensure officers are using
force in a manner consistent with constitutional standards and
the department's policies. Use of force reviews may identify
both officer training needs and patterns of unauthorized or
excessive uses of force. The YPD lacks a clear policy on
reporting uses of force, as well as for reviewing uses of force
and investigating those that appear excessive, avoidable,
inconsistent with YPD policy and/or indicative of potentially
criminal conduct.

With respect to reporting use of force, for example, it does
not appear that the YPD has a separate form for reporting use of
force incidents. To the contrary, the YPD appears to use the
same YPD-28 Form for every arrest, incident, and use of force
that does not involve a firearm. We understand that Form U.F.
104 is to be completed when use of force involves the discharge
of a firearm. However, use of a baton and deployment of a K-9
Unit are examples of uses of force that should be reported in the
same manner as the discharge of a firearm. We would thus
recommend that one form be used when documenting any use of force
incident. Without such form, the review process of use of force
incidents becomes more difficult.

Further, the YPD's reporting requirements on the use of
force appear arbitrary. For example, a review of reporting
requirements when a police baton is used provides that "[i]f more
than one officer used their baton during the same incident,

supplemental reports are to be completed by each of those officers." Policy 1.09.02.IV.D.6. By contrast, reporting requirements for the use of shotguns is different; the policy provides that "[i]n an incident where several shotguns were used, the reporting officer will make one report concerning the entire incident, including the names of officers involved, thereby eliminating the need for a report from each officer." Policy 1.08.01.IV.F.3. We recommend that the YPD correct such discrepancies, requiring each officer involved in using force to complete a use of force report. Doing so allows a supervisor to assess the reasonableness of each separate use of force to determine its appropriateness.

## III. Investigations

As a general matter, supervisory oversight of officers' use of force is critical for a department to ensure that its officers' use of force is consistent with departmental standards. It is also important for a department to ensure that its officers are using force in a constitutionally reasonable manner. See Tennessee v. Garner, 471 U.S. 1 (1985).

### A.  Investigation of Citizen Complaints

An open, fair, and impartial process for receiving and investigating citizen complaints serves several important purposes. An appropriate citizen complaint procedure ensures officer accountability and supervision, deters misconduct, and helps maintain good community relations, increasing public confidence in and respect for the YPD. Improving the YPD's current procedure for handling citizen complaints would maximize these goals.

### 1.  Public Awareness of YPD's Citizen Complaint Process

While the YPD currently has a system for intake of citizen complaints, the YPD should increase public awareness of how to utilize the citizen complaint process." The YPD should

[11] We understand that a citizen may submit a complaint in person; by phone through a twenty-four hour hour service; by calling Internal Affairs directly; by mail; and by facsimile. While this system provides the Yonkers community with a variety of methods to submit a complaint, it is ineffective if the community at large is not fully aware of the various methods that a citizen may employ to submit a complaint.

disseminate information to the public about the citizen complaint
process.  Each police station should have complaint process
information posted in a visible place in the public reception
area.  While information regarding the citizen complaint process
is currently available on-line, the Internet should not be the
only means of public notification of the complaint process.  Not
all members of the Yonkers community have access to a computer or
the Internet.  Indeed, many of the citizens we encountered did
not appear to be aware of the alternative methods available for
submitting a complaint.  Therefore, we recommend that information
about the complaint process also be posted prominently at the YPD
headquarters and other public facilities.  The YPD should also
consider soliciting feedback regarding public perception of that
process and establish a citizen survey to gauge the public's
perception of the complaint process.  See, infra, Section VI.A.2.
 Responses to a survey from citizens will enable the YPD to
ascertain whether members of the community are intimidated by the
process of filing a complaint, and thus, allow the YPD to address
any concerns raised.

## 2.   Intake and Tracking of Complaints

     A complaint process should allow the public unfettered
access to make complaints.  An open complaint process
contemplates that complaints will not be actively discouraged.
We encourage the YPD to adopt a policy that explicitly prohibits
any conduct that would tend to discourage a citizen from making a
complaint.  The recommended policy would further provide that an
officer who violates the policy will be met with discipline or
other corrective action.

     The YPD should accept all complaints of actions that, if
true, would constitute a violation of the applicable laws, or
YPD's rules and regulations.[12]  In particular, the YPD should be
mindful of language that may conflict with its policy requirement
to document all citizen complaints.  The YPD should also strongly
discourage informal complaint resolution in all circumstances.
For example, Policy 5.03.01.IV.A.7 allows an officer to resolve a
citizen inquiry.  While noting that there is a "fine line ...
between complaints and inquiries," the provision contains
potentially dangerous language whereby an officer receiving a
complaint may believe it is permissible to encourage a citizen
not to file a complaint.  The YPD should also reinforce with its

---

     [12]     The manner in which the complaint is submitted, either
by telephone, submission of a citizen complaint form, or personal
letter, should not be an impediment to its receipt.

- 20 -

staff that failure to accept a citizen complaint is always unacceptable. Therefore, we recommend that the YPD create a specific Departmental Order clarifying all employees' roles in accepting and investigating complaints. We also understand that Patrol Sergeants are required to carry complaint forms. We recommend that sergeants and other YPD personnel charged with providing and accepting citizen complaints be given appropriate training on handling citizen complaints with an emphasis on interpersonal skills.

Similarly, complaint forms should be readily accessible and available to any person who wishes to lodge a complaint. Currently, citizen complaint forms are available at the Police Department, upon request from a Patrol Sergeant, or on the Internet. The complaint forms, however, are not available at public facilities, such as libraries. It can be intimidating to request a complaint form directly from the YPD. Accordingly, the complaint forms should be available for collection in publicly accessible locations that should permit the forms to be obtained without a specific request by a citizen, e.g., blank forms placed in a publicly accessible area for the taking. The citizen would be responsible for submitting the complaint form to the YPD.

Moreover, the citizen complaint process should be accessible to all members of the Yonkers community, including non-English speaking members of the community. Yonkers is a diverse community, with a growing Hispanic population, however, information regarding the citizen complaint process and the citizen complaint forms is available only in English. We recommended that YPD make available information regarding the citizen complaint process and that complaint forms be in languages consistent with, and reflective of, the city's diversity. In this regard, Title VI of the Civil Rights Act requires that recipients of federal funds take reasonable steps to provide meaningful access to limited English proficient communities.[13] As recipients of such funding, and given the City

---

[13] Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. For the YPD's convenience, we attach two documents that contain examples of steps that might be taken or considered by the YPD. Specifically, we attach a Memorandum of Agreement between the United States of America and Lake Worth, Florida Police Department, dated March 13, 2007 (Exhibit A), and a Law Enforcement Planning Tool, entitled "Consideration of Language Assistance Policy and Implementation Plan for Addressing Limited English Proficiency in a Law Enforcement Agency" (Exhibit B).

- 21 -

of Yonkers' growing Hispanic population, the YPD should ensure that complaint forms and information regarding the complaint process are available in Spanish and that some officers are familiar with rudimentary Spanish. In addition, officers would benefit from receiving diversity training. Such training would increase cultural awareness, allow the YPD to better interact with the community it serves, and eliminate biases. By way of example, we note that during our visit with the YPD, we had several discussions relating to diversity issues. During one of these discussions, a YPD supervisor unintentionally used questionable language to refer to minorities on staff. Diversity training can enable the YPD to better address and interact with all individuals.

Upon receiving a citizen complaint, all complaints should be assigned a tracking or control number. The YPD should promptly confirm receipt of the complaint with the complainant, in writing, and provide the tracking number to the complainant, along with the YPD contact information, in the event the complainant would like to check the status of the complaint.

### 3.   Investigation Timeline

Policy 5.03.01.IV.G.4 requires all investigations, where practicable, to be completed within 15 days (unless the deputy chief is notified and agrees to an extension) and all precinct-level investigation to be completed within 30 days (unless the Commissioner grants an extension). Our interviews, however, revealed that YPD complaint investigations do not consistently follow the timelines set forth in the Manual.

On its face, the YPD's current timelines for the completion of citizen complaint investigations does not seem to provide adequate time for a thorough investigation and may lead, especially at the precinct level, to a mere paperwork review by the supervisor, resulting in an ineffective complaint resolution process.

We recommend that the YPD policy on complaints specify a clear and adequate timeline under which complaints will be investigated and adjudicated. We recommend that the policy require that, absent exigent circumstances, all investigations be completed within 45 days, including review of the investigation by the Commissioner or his command staff designee within that time frame. Internal adjudication, if any, of the results of the investigation should be timely completed within deadlines specified under the YPD's labor agreements. Imposition of discipline, if any, should occur within 30 days of the end of the

- 22 -

Commissioner's review or the end of internal adjudication. Extensions beyond these time periods should require the Commissioner's written approval (rather than the deputy chief's approval), based upon criteria set out in the Manual, and be communicated in writing to the complainant.

**4. Identification of YPD Employees by Complainants**

A complainant should be encouraged to identify the YPD employee related to the incident described in the complaint. Some departments have prepared a directory that includes the names and faces of department staff so that complainants are able to identify the employee involved in their incident. We recommend that the YPD consider creating something similar to a directory that is accessible to complainants at all times at the precinct, and during working hours, where Complaint forms or may be submitted. We also recommend that the YPD update the Complaint form to provide a space for a complainant to submit the case number or ticket number of the police action from which the complaint arises. Obtaining this information from complainants should facilitate an accurate and more efficient resolution to complaints.

In the course of our investigation, we observed that YPD officers did not wear name plates. The lack of name plates poses a potential impediment to the accurate identification of YPD employees involved in alleged misconduct. The lack of name plates complicates efforts by citizens to report complaints of misconduct, and may lead to instances of officers incorrectly being the subject of citizen complaints. Therefore, we further recommend that, as part of the YPD uniform, YPD officers wear name plates indicating their rank and surname.

**5. Investigation of Citizen Complaints**

The YPD should develop and implement a centralized, formal, structured, and consistent system for resolving complaints without discouraging the filing of complaints.

Currently, the YPD resolves complaints through two avenues: (1) investigation by the Office of Professional Standards,[14] or (2) investigation conducted by personnel at the precinct or division level. Policy 5.03.01 indicates that the Office of

---

[14] Recent YPD organizational charts indicate that the Office of Professional Standards has either been incorporated into, or renamed as, the Internal Affairs Division.

- 23 -

Professional Standards will investigate all allegations of criminal conduct, as well as allegations of "corruption, brutality, death or serious physical injury of a complainant." While YPD policy indicates that for each complaint, the subject's commanding officer, the deputy chief, and a commanding officer from the Office of Professional Standards will confer to determine who will conduct the investigation, it does not detail which types of allegations may be resolved at the precinct level or what factors must be considered before referring a complaint for precinct level investigation.

We recommend that YPD revise its policies to provide objective criteria for the assignments of citizen complaints to both precinct level and Office of Professional Standards investigation. Moreover, YPD should memorialize all such investigative decisions in writing. Implementing a written criteria will bolster accountability regarding investigation referrals and increase the public and internal perception of legitimacy in the complaint process by both YPD personnel and citizens.

In addition, the YPD should revise its investigation policy to include examples of incidents the YPD considers should be investigated at the precinct level, versus those that should be investigated by the Office of Professional Standards. Further, the YPD should offer guidance on incidents that would otherwise be dealt with at the precinct level, but because of repeat complaints would warrant a more expansive review by the Office of Professional Standards.

### 6.   Investigative Training

We recommend that YPD personnel charged with handling complaints, whether conducting intake or investigating complaints, receive specialized training before undertaking such responsibilities. The training should include investigative and interview techniques, such as examining and interrogating witnesses (e.g., not asking inappropriate leading questions or automatically giving undue weight to an officer's statement versus a citizen's statement); identifying misconduct even if it is not specifically alleged in a complaint; ethics; integrity; professionalism; the factors to consider when evaluating complainant or witness credibility; and the appropriate burden of proof (i.e., preponderance of evidence).

- 24 -

## 7. Centralized Investigation Assignments

Policy 5.03.01.IV.B.1 indicates that the Office of Professional Standards provides supervisors with inter-unit case control numbers for all complaints. While the Office of Professional Standards investigates a number of citizen complaints, many complaints are investigated and resolved at the precinct level.

Policy 5.03.01.IV.C.5 does not indicate that the Office of Professional Standards stores any information (other than the inter-unit case control number) regarding precinct level investigations. YPD should revise its policies to require that all precinct supervisors forward copies of all complaint documents, findings, and recommendations to the Office of Professional Standards for tracking and monitoring. YPD policy should also require the Office of Professional Standards to conduct periodic reviews, across all precincts, of precinct level investigations to determine whether complaints are investigated thoroughly, appropriate recommendations are being made, and corrective actions are being implemented.

## B. Potential Criminal Investigations

Some allegations of misconduct, including citizen complaints, may be sufficiently serious to warrant referral to local or federal prosecutors or other law enforcement agencies. While Policy 5.03.01.B.4 indicates that the Commissioner will authorize all criminal investigations arising out of complaints reviewed by the Office of Professional Standards, YPD policy does not address bifurcation of criminal investigations and administrative investigations. Such investigations should be separated (although they may proceed along parallel tracks, if appropriate) so as to avoid compromising the integrity of the criminal investigation or infringing upon the rights of officers. See Garrity v. New Jersey, 385 U.S. 493 (1967) (ruling that officers must be adequately apprised of rights against self-incrimination to preserve the integrity of any potential criminal investigation).

In revising its policy on administrative investigations, the YPD should provide guidance to command staff and their designee(s) as to which complaints are appropriate for internal review and which complaints should be referred outside the YPD or to a separate unit within the YPD for potential criminal investigation.

- 25 -

The Manual should also clarify the rights of officers involved.  During investigations of potentially criminal misconduct officers should be read rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), before questioning; and may be entitled to have counsel present.  Moreover, each YPD officer is entitled to protection pursuant to Garrity, 385 U.S. 493, against the use in subsequent criminal proceedings of statements compelled from him or her in administrative proceedings under threat of disciplinary action.  This policy should be consistent and coordinated with the policy regarding investigation and evaluation of complaints.  Such coordination will prevent situations in which the protocol used to investigate a complaint is incompatible with the requirements for the investigation of serious misconduct, thus compromising the integrity of each investigation.  For example, if a complaint alleges that serious misconduct might have occurred, YPD policy should require that such a complaint be investigated under the heightened standards, rather than the standards applicable to complaints that do not involve allegations of serious misconduct.

Accordingly, we recommend that the YPD adopt and adhere to a policy requiring that the Commissioner, in consultation with the YPD's legal counsel, timely refer allegations of potentially criminal conduct to appropriate local or federal prosecutors.

## C.    Investigation of Collateral Misconduct and Duty to Report Misconduct

While Policy 5.03.01.IV.D.3.e allows for a YPD investigator to indicate that acts of misconduct were discovered during the investigation that were not alleged in the original complaint, there is no corresponding YPD policy requiring the alleged misconduct to be investigated.  Therefore, we recommend that YPD investigators be required to report and investigate evidence of violations of law or policy that come to light in the course of internal affairs investigations.

Moreover, Policy 1.02.06, regarding officer responsibilities and procedures, does not explicitly state that officers must report violations of law or YPD codes of conduct that would subject an officer to disciplinary action.  We recommend that the YPD revise its policies to require that officers who witness misconduct by other officers be required to affirmatively report such conduct to the sergeant on duty.  We recommend that an officer who fails to report the misconduct of another officer be subject to discipline or other corrective action.

- 26 -

**D.   Discipline**

The imposition of discipline or corrective action (e.g.,
retraining) is crucial to address and minimize officer misconduct
or policy violations.  While Policy 5.03.01 references discipline
as a potential result of an internal investigation, the policy
does not delineate a specific disciplinary system.  A proper
system puts an officer on notice as to which conduct is
prohibited and informs the officer on the range of penalties for
each violation.

Consistent with state law and the relevant bargaining unit
contract, we recommend that the YPD develop a consistent and
transparent system to impose discipline.  Such a system should
identify ranges of appropriate disciplinary action that would
consider not only the nature of the infraction, but also other
factors, such as prior disciplinary history.  Those serving on
any departmental hearing panel charged with imposing discipline
must be trained appropriately.  The YPD should track records of
any discipline received by an officer, as well as the date of the
disciplinary action.

**IV.   Supervisory Oversight**

**A.   Risk Assessment and Management**

As part of routine supervisory activities, YPD command staff
should examine and review officer conduct on a regular basis as a
proactive measure to minimize and detect misconduct, and to
identify training and policy issues.  Our investigation thus far
has revealed a lack of structured oversight of YPD officers by
command staff.  Due to an agreement with the Yonkers Police
Benevolent Association, the YPD does not conduct evaluations for
police officers, and any review of officer activity appears to be
informal and ad hoc.

We recommend that the YPD implement policies and procedures
for supervisors to routinely review all aspects of officer
conduct, including a review of:  (1) all uses of force;
(2) probable cause for arrests and the appropriateness of charges
filed; (3) reasonable suspicion for stops and searches that do
not result in an arrest; and (4) citizen complaints filed against
an officer.  We recommend that YPD policy require supervisors to
review and approve all arrest reports and search-and-seizure
reports, and to record their approval on the arrest or incident
reports by handwritten or electronic signature.  We recommend
that the Commissioner, or his designee, meet annually with at
least the YPD officers who have been subject to discipline or

- 27 -

corrective action within the prior year to discuss positive aspects of his or her police work, his or her complaint history, if any, and to discuss any problems or concerns officers may have concerning the department.

## B.   Disparate Scheduling

Policies 1.06.04, regarding Authority, Responsibility, and Command, and 1.06.05, regarding Chain of Command, illustrate the YPD's desire for unity of command.  In particular, Policy 1.06.04.III.A requires that each individual and division commander have only one supervisor on duty to prevent conflicting orders, confusion, and discord.  Nevertheless, the YPD's current practice of scheduling lieutenants and sergeants to work overlapping (but not concurrent) shifts with patrol officers leads to a lack of continuity in supervision and may contribute to potential problems such as those that Policy 1.06.4 seeks to expressly avoid: "conflicting orders, confusion and discord." Policy 1.06.4.III.A.

In order to increase responsibility and ensure accountability, the YPD should align patrol officer and supervisor schedules.  Arranging patrol officer and supervisor schedules to provide consistency of supervision will enable supervisors to build necessary relationships to effectively mentor patrol officers.  We understand that a solution to this problem may require either negotiations regarding the collective bargaining agreement or an entirely new supervisory strategy that takes into account YPD's disparate scheduling.  While this difficult task requires a creative solution, resolution of this issue is essential to ensure accountability within the YPD.

## C.   Early Warning System

The YPD has no risk management policy requiring comprehensive review of use of force and complaint incidents. Commissioner Hartnett and other YPD command staff have acknowledged the need for an Early Warning System ("EWS") to address risk management.[15]  We credit the YPD for identifying this

_____

[15]    An EWS is a data-based police management tool designated to identify potentially problematic behavior and allow early intervention to correct misconduct and assist in identifying deficiencies in supervision, management, and policies.  Police departments typically use EWS data regularly and affirmatively to promote best professional police practices, accountability and proactive management; to manage the risk of

weakness, and we encourage quick adoption of an EWS that is appropriate and applicable to the YPD's needs and size, as an integral part of its risk management program. Either a paper-based or a computer-based EWS will provide a useful assessment tool for each officer's conduct and an overall assessment of YPD as a law enforcement agency.

We recommend that the YPD implement policies and procedures to collect data on individual officers for the purpose of maintaining, integrating, and retrieving information necessary for effective supervision and management of YPD personnel. The EWS should contain information on all investigations and complaints, including non-sustained complaints and complaints prior to final disposition, discipline and other supervisory corrective measures, uses of force, arrests and charges, searches and seizures, service calls, training, awards and commendations, sick leave, civil lawsuits, and other items relevant to an officer's conduct. The effective gathering of data will require the support of other City departments. The City of Yonkers law office should report to the YPD when an officer is named in a civil complaint relating to policing work or risk factors. Similarly, the Yonkers District Attorney's office should report to the YPD on any matters relating to an officer's integrity or credibility.

The YPD should then use EWS data regularly and proactively to: (1) promote best professional police practices; (2) improve accountability and management; (3) manage the risk of police misconduct and potential liability; (4) evaluate and audit the performance of all levels of the YPD, its members, and its units on an ongoing basis; and (5) evaluate and assess the effectiveness of training and policy. We recommend that the YPD require supervisors, including command staff, to review this data for every officer they supervise on a regular, predetermined basis, such as on a quarterly basis. When supervisors review their subordinates' data, we recommend that the YPD utilize comparisons to peers. Supervisors should compare their subordinates' data concerning complaints, use of force reports, and other pertinent information about a particular officer with the same categories of information from other officers on the same patrol team or shift. Similarly, command staff should review the data for the units they command and compare these data with peer units. In addition, the policy should provide explicit guidance to supervisory officers reviewing reports to ensure that

---

police misconduct and potential liability; to evaluate and audit the performance of officers and units; and to identify, manage, and control at-risk officers, conduct, and situations.

patterns of possible misconduct are identified, analyzed, and
addressed properly by command staff.  The aim of this process is
to give supervisors valuable information that, if received early,
could identify potential problem officers before misconduct
actually develops.  In addition the process can be used to
promote, commend, or otherwise recognize outstanding officer
performance.

To use the EWS effectively as a predictive model tool, the
EWS must have defined triggers for management intervention.  The
policy implementing these recommendations should also establish
guidelines regarding specific events that will trigger an
additional supervisory review, such as a specific number of uses
of force or citizen complaints within a discrete period.  Once an
officer has been selected for this additional review, a report
should be prepared for his or her supervisor that details all use
of force reports, formal and informal complaints, calls for
service, sick leave, counseling reports, civil lawsuits, and
commendations pertaining to the officer over an appropriate time
of review.  The officer's immediate supervisor and command staff
should then meet to discuss the report and determine if any
corrective action is warranted.  The supervisor's and command
staff's recommendations should then be forwarded to the
appropriate Deputy Chief for his or her timely review and
implementation.  The effectiveness of the implemented
recommendations should be determined by monitoring the officer
and drafting written reports on the officer's conduct on a
monthly basis.  The officer's supervisor should retain the
supervisory recommendations and the written monthly report in his
or her supervisory file.

D.   **Expansion of CompStat Process**

During our site visit, one of our police practices
consultants observed YPD's CompStat process, finding it
impressive and effective.[16]  We encourage Commissioner Hartnett to
implement his plan to include civilian complaints in the CompStat
process.  In addition, we recommend that the YPD consider
expanding its successful CompStat process to track officer
conduct though review of materials generated from any Early

---

[16]    CompStat, short for Computer Statistics, refers to a
management tool used by police departments to collect, analyze,
and map crime statistics and patterns, as well as other data, in
an effort to reduce crime, improve quality of life, assist in
formulating deployment strategy, and measure police performance
on a regular basis.

Warning System the YPD chooses to implement. Finally, we suggest
that the YPD include a community relations aspect in its current
CompStat process to ensure that the YPD's current
relationship-building initiatives are effective and to encourage
creation of new initiatives.

## V.    Training Program and Materials

### A.    Field Training Program

A structured field training program for training new
recruits is an integral component of any comprehensive officer
training program.  An effective field training program can
reinforce training learned at the police academy, as well as
minimize the risk of officers engaging in problematic behaviors,
including the use of excessive force.  Although YPD has some form
of field training for new officers, there is no formal field
training program in place that delineates the substantive content
and goals of the program or sets forth the criteria for
selection, training, and, if warranted the deselection of field
training officers ("FTOs"), who are instrumental to any field
training program.

The YPD should develop and implement a comprehensive policy
regarding field training.  Field training typically occurs during
an officer's first 12 weeks on duty following police academy
training.  YPD's field training program, however, is
significantly less than twelve weeks, and exposes new recruits to
only two of the four precincts, rather than providing each
recruit with exposure to all the various precincts and the
uniqueness of each precinct.  Additionally, there does not seem
to be a consistent lesson plan for all new recruits, or an
evaluation process that tracks the development of skills and
substantive knowledge taught throughout the program.  We
encourage the YPD to develop a formal and structured field
training program.

We also note that well-qualified FTOs are critical to
ensuring well-trained police recruits.  The YPD, however, has no
formal policy addressing the selection, training, and deselection
of FTOs.  FTOs should have at least three years experience on the
YPD.  An FTO candidate's experience, use of force and complaint
history, and interpersonal skills should also be considered as
selection criteria.  All FTOs should have completed a course on
how to serve in that capacity, and the course should be similar
in length and scope for all FTOs.  We recommend that the YPD take
measures to recruit and train qualified FTOs, including providing
incentives to current officers to encourage them to apply to

become FTOs.  The YPD should also develop and implement a
comprehensive policy and mechanism for evaluating and/or
recertifying FTOs and for removing FTOs who fail to perform
adequately, or whose actions while serving as an FTO would have
disqualified them from selection in the first instance.

**B.    Training Materials**

A review of the YPD's training materials indicates that, in
many instances, the training materials are highly technical and
mechanical, comprised of reprinted materials from the Manual, as
well as general manufacturing information on design, function and
maintenance of firearms.  The training materials lack skills and
context training, fail to train on the use of force, how to use
alternative defensive measures (e.g., verbal judo), legal issues
(e.g., the Supreme Court's ruling on Tennessee v. Garner) or
other issues essential to police work.

Additionally, as the training materials are comprised of
excerpts from the Manual, and/or cross reference the Manual, the
training materials are as dated as the policies on which they
rely.  Thus, some of these materials are more than 10, and in
some instances more than 20, years old.  To the extent any of the
training materials cross-reference the Manual, we recommend that
those training materials be revised and updated.[17]

The training materials should also be revised and updated to
instruct officers on reporting requirements, and on how to
interact and communicate with citizens.  As noted above, training
should include de-escalation techniques for interacting with
citizens, especially those who may be mentally ill or who may be
under the influence of drugs or alcohol.

**C.    Implementing In-Service Training**

It does not appear that the YPD has a formal in-service
training program.  We recommend in-service training as a valuable

---

[17]    Like the Manual, the training materials are also
voluminous and fragmented.  We would recommend that the YPD
undertake to condense and organize the training materials to
allow for ease of reference.  Additionally, certain aspects of
the training materials, such as teachings on the use of force
continuum, should be incorporated and made part of YPD policy.

- 32 -

tool for reinforcing officer safety and for ensuring that officers maintain familiarity with issues that are essential to police work, such as evolving legal developments, tactical and use of force updates, searches and seizures, and police integrity. By way of example, such in-service training could be incorporated as part of officer roll call, so as to take advantage of that time on a more substantive level. We also recommend that any training during roll call or otherwise be conducted by instructors who have been trained and certified to be instructors and who are competent in the subject matter being taught.

VI.    Community Relations

The YPD should work to improve its relationship with the Yonkers community. Citizen interviews and news reports revealed allegations of distrust and fear of the YPD. Deep seated concerns of racial animus impede attempts at reconciliation. The fact that a negative perception exists is reason enough for the YPD to address these concerns. Therefore, we recommend that the YPD emphasize community relations as one of its core values and expand its community outreach beyond the Community Affairs Division by making it an integral part of policing. To improve the role of the Police Professional Standard Responsibility Committee ("PPSRC") in community affairs and broader dissemination of the role of the PPSRC, we recommend the following: (1) increase public awareness and knowledge of the committee and its requirements to increase public awareness and participation; (2) citizen participation in the review of policies and procedures; (3) formulation of citizen surveys; (4) increased professionalism, including the courteous interaction with members of the community and wearing of name plates that indicate an officer's rank and surname on their uniform; and (5) as recommended above, education about how to access and utilize the complaint process.

A.    The Police Professional Standard Responsibility Committee

1.    The Role of the Police Professional Standard Responsibility Committee in Community Affairs

The PPSRC was established in 1993 to allow community representatives of the community an opportunity to review internal investigations alleging excessive use of force, abuse of authority, discourtesy, and the use of offensive or discriminatory language. The PPSRC

- 33 -

was to serve a dual function:  review of select internal
investigations and community liaison.  However, in practice, the
PPSRC is outdated and inconsistent with later enacted policy.
Specifically, Policy 1.06.03, circa 1993, is inconsistent with
the Community Relations Policy ("CRP"), Policy 2.04.03,
established in 2003.  In particular, Policy 2.04.03 does not
reference the PPSRC or its policy.  Moreover, given Policy
2.04.03, the purpose of the PPSRC is in question as officers may
perceive the requirements of this policy to override rather than
incorporate the requirements of the PPSRC policy.  For example,
the PPSRC policy references the Task Force on Police-Community
Relations; however, there is no mention of this Task Force in the
CRP nor did command staff mention this Task Force during our
interviews.  The PPSRC does not appear to fall within the current
YPD organizational structure and it is unclear whether oversight
for the committee falls within the responsibility of the
Community Affairs Division, Internal Affairs, or the Office of
Professional Standards.  It is also unclear whether the Task
Force on Police Community Relations identified in the PPSRC
policy still exists, and if so, to which department it is
accountable.  As a result, the role of the PPSRC within the YPD
and as a necessary component of community relations and the
citizen complaint process is diminished.

It appears that the YPD is seeking to revise the PPSRC in
order to respond to public criticism regarding police misconduct.
However, revising an outdated policy without accounting for
potential conflict stemming from later enacted policies may cause
confusion and inconsistencies that may derail the intended goal.
Therefore, we recommend that the YPD reexamine the PPSRC Policy
in light of the CRP to ensure cohesion with YPD policies and
organizational structure, including oversight and management.
Lastly, we further recommend that the Community Affairs Division
be involved in the administration of the PPSRC, including its
promotion within the Department and throughout the Yonkers
community.

## 2.   Public Awareness of the PPSRC

The YPD should provide the community with complete and
accurate information regarding the PPSRC in order to increase
public awareness and participation in the committee.  Based on
our interviews with members of the YPD and the community, it
appears that the PPSRC has not been convened for some time.  In
fact, some citizens and community leaders were either unaware the
committee existed or were skeptical of its purpose.

- 34 -

Community representation is an essential component of the PPRSC. YPD Policy requires the committee to have four four community representatives. During our investigation we learned that YPD has encountered recruiting difficulties regarding the PPRSC. We recommend that the YPD take a proactive approach in recruiting members for the PPRSC by widely disseminating information regarding the committee and its mission. It is also important for YPD representatives promoting the PPRSC to be well versed in the policy, especially the extensive selection and participation criteria. Participation in the PPRSC involves a time commitment that may deter some citizens who are interested but may find it difficult to balance with work and/or personal responsibilities.[18] Thus, it is especially important for the YPD to address these concerns so as to maximize community involvement. During our investigation, for example, we attended a community meeting where the YPD representative gave a cursory presentation of the PPRSC and was unable to respond to community questions. One question involved the program's structure and time commitment. The YPD's representative was unable to answer the question. The Department's inability to provide a complete and accurate portrayal of the PPRSC, including scheduling and anticipated time commitment, may discourage community involvement and detail the YPD's recruiting efforts. Therefore, we recommend, that the YPD ensure the meaningful distribution of information about the PPRSC, its function, selection process, and participation requirements, to maximize community involvement.

## B.   Citizen Participation in Policy Development

The YPD is in the process of revising its policies and procedures, many of which are substantially dated. The absence of substantial revisions to the Manual suggests that the YPD does not have a formal process for policy development and as a result, no mechanism to ensure community feedback. See, supra, Section I. Therefore, we recommend that the YPD elicit input from the community on policies that are of particular concern to members of the public. Indeed, the PPRSC policy provides some guidance for this recommendation and allows for measured community involvement in policy development. See Policy 1.06.03.V.F.

[18] The selection and participation criteria includes a residency requirement, exemption of law enforcement professionals or member of public office, and successful completion of the Yonkers Civilian Police Academy and a series of workshops on the civil rights and liberties of civilians during police encounters.

- 35 -

While we appreciate that not all recommendations by the community
may be practical or appropriate, we believe that the very act of
allowing for community involvement and feedback may increase
community acceptance, understanding, and awareness of law
enforcement issues.  Partnering with the PPSRC could alleviate
some of these concerns, given the extensive selection and
participation requirements community members must undergo in
order to sit on the committee.  Community involvement may also
provide an opportunity for awareness and education on public and
departmental concerns, as well as promote positive citizen-police
interactions.

C.    **Citizen Surveys**

Citizen surveys provide a valuable tool to gauge the
community's perception of the YPD's performance.  Citizen surveys
also provide an opportunity for YPD management to identify areas
for improvement and to address serious areas of concern.  The
YPD, for example, has a Community Affairs Division that is
responsible for interacting with the community to identify needs
and address problems.  However, it is unclear how successful this
community outreach has been.  An independent citizen survey could
serve to enhance this commitment.  Therefore, we recommend that
the YPD conduct a comprehensive citizen survey that will identify
areas for improvement and address concerns regarding community
relations and policing.  To assist in this effort, we further
recommend that the YPD enlist the assistance of a third party to
co-design and administer the survey.  Enlisting the assistance of
a third party to administer the surveys will allow for greater
accuracy and a more candid exchange of ideas.

D.    **Professionalism**

While the vast majority of YPD personnel we encountered were
courteous and professional, we have received numerous complaints
of rude and discourteous conduct by officers towards citizens.
Indeed, YPD command staff raised similar concerns and in response
has developed the Mutual Courtesy & Respect Campaign ("MCRC") to
encourage its officers to engage the community respectfully.  The
goal of the MCRC is to foster positive relations between the YPD
and the Yonkers community by requiring members of the community
to adhere to a similar level of respect and courtesy when dealing
with members of the YPD.  Although the ultimate goal of the
campaign is admirable, the MCRC, as written, is confusing and
indicative of a larger cultural problem within the YPD.
Specifically, the MCRC fails to identify the nexus between

- 36 -

courtesy and safety and fails to articulate the sentiment that
the more professional a police officer is, the more likely it
will be for the police officer to receive respect and courtesy
from the community.

As we recommended earlier in this section, the YPD should
emphasize community relations as one of its core values. Respect
and courtesy is part and parcel to those values. Therefore
professionalism should be an integral component of the YPD's core
values. However, the tone of the MCRC detracts from this goal
because the language is at times defensive, focuses on police
officers receiving respect rather than giving respect, and
suggests that the community is incapable of being civil and
courteous.

The MCRC language reads more like a campaign to treat the
police with respect rather than focusing on an officer's duty to
treat the community with respect. Police encounters are, at
times, volatile, and sometimes the community may not be as
courteous and respectful as an officer may like; however, an
officer must be respectful at all times. Even in situations
where a citizen is not respectful or courteous, police officers
are required to resolve the situation in a professional manner.
However, the MCRC language implies that there may be an end to
courteous treatment depending on the situation. The MCRC defines
the term "mutual" as "given and received in equal amounts;
shared, common, reciprocate." This definition suggests that in a
situation where courtesy and respect is no longer "given and
received in equal amounts," an officer is no longer required to be
professional. This philosophy negates the very intent of the
campaign and is a dangerous philosophy to impart to police
officers. Rather than penetrating existing precinct culture and
philosophy that may impede its successful implementation, the
MCRC language reinforces this philosophy. Indeed, during our
tour we interviewed one commanding officer whose philosophy was
similar to this interpretation, that is, an officer should treat
citizens with respect, "until they prove they don't need to be
treated with respect."

Moreover, the MCRC language appears to devalue the
importance of the Yonkers community. On the one hand, the MCRC
states that there is a "strong bond" and a "solid" "partnership"
between the Department and the community. On the other hand, the
MCRC suggests that the Yonkers community does not recognize or
value the police department. In both instances, the community's
sentiments, positive or negative, are ignored. First, it is

- 37 -

disingenuous to suggest a strong community bond, where community
groups have been vocal about police misconduct and
discrimination.  To do so, sends a negative message to the
community that their concerns are being ignored.  Second, instead
of building a bridge towards understanding and dialogue, this
Campaign suggests that the community does not appreciate the YPD
and should be more respectful of officers.  The MCRC contains
several references to the "thankless" nature of police work.
While police work can be thankless and difficult, such repeated
references appear defensive, may create a barrier between the YPD
and the community, and may ultimately detract from the purpose of
the Campaign.

     Mutual sensitivity and on-going dialogue and partnership
between the YPD and the Yonkers community will help to facilitate
a growing bond between the Department and the community.  The
YPD's attempt at fostering this dialogue with the MCRC is
laudable, however, the sentiments conveyed by its language may
impede its successful implementation.  Professionalism is a
sensitive topic because how police officers interact with the
community impacts perception.  Currently, the community has a

Accordingly, we recommend that the YPD seek out community
involvement in evaluating the MCRC and providing feedback
regarding its language.  Community involvement at the drafting
stage may assist the YPD with delivering the appropriate message.
Moreover, in order for this campaign to be successful among the
rank and file, it is important for the YPD to address any
existing YPD philosophy that may impede its successful
implementation.  Thus, we further recommend that officers be
given appropriate training on community interactions, emphasizing
interpersonal skills.  We cannot overstate the importance of
respect and courtesy in obtaining and maintaining successful
community relations.  Professionalism breeds confidence and being
professional in all situations will improve the YPD's
relationship with the community and its reputation within the
community.

## VII. Personnel

### A.   Police Officer Evaluations

     While Policy 1.03.09 addresses employee performance
evaluations, we understand that, as the result of a court
decision regarding a grievance filed by the Yonkers Police

- 38 -

Benevolent Association, the YPD does not conduct evaluations of police officers. The lack of such reviews strikes directly at the heart of accountability and is compounded by inconsistent supervisory schedules, lack of tracking use of force incidents, and the lack of an early warning system.

We recommend that the YPD create a formal evaluation system for police officers. In creating the system, we recommend that the YPD revise Policy 1.03.09 to incorporate standards for conduct and detail any disciplinary consequences that could result from an officer's failure to maintain such appropriate standards of conduct. In addition, in order to promote better relations between the YPD and the community, the YPD should evaluate its officers on how they interact with the community, and thus address any citizen complaints against an officer as part of the evaluation process. See supra Parts III.D; IV.A.B.

As the YPD implements an officer evaluation system, we recommend that one person timely train the entire department on the composition and use of the system. This person should train all managers how to evaluate their staff, and inform all line officers as to how they will be evaluated. This uniform training should eliminate different interpretations of the system, and ensure the integrity of the evaluation information.

We recommend that direct supervisors evaluate their subordinates annually. Prior to the evaluations, supervisors should explain the evaluation process and the expectations to their subordinates. After the direct supervisor completes the evaluation, the entire chain of command should review the evaluation and add comments. The evaluations should be stored in the employee's training or personnel file. The YPD should tie these evaluations into its promotion process, to the extent permitted by law and the YPD's collective bargaining agreements.

B. Recruiting

During our investigation we learned of the YPD's desire to attract minority applicants. Indeed, Command Staff acknowledged during interviews that the YPD has far fewer minority and female officers than one would expect in a diverse community like Yonkers, particularly among the command staff (as of the time of our visit, there was only one African American male sergeant; four Hispanic sergeants; and one Caucasian female captain). In light of the racial and ethnic composition of the Yonkers community, we recommend that the YPD develop a specific

- 39 -

recruiting and marketing strategy to increase the number of
candidates of diverse background so that the composition of the
Department is a reflection of the community it serves.  Such
strategies may include a public relations campaign geared towards
particular racial and ethnic groups in various languages.
Currently, the YPD does not have a recruitment plan that
identifies the various marketing strategies it intends to employ.
We recommend that the YPD establish a recruitment plan that
identifies recruitment goals and objectives for the next
recruiting cycle.  We also recommend that the Department review
its selection process, including hiring and promotion.  The City
should also designate and train an Equal Employment Opportunity
officer to ensure compliance with federal anti-discrimination
laws and to assist the YPD in developing a more diverse personnel
roster.  The police department in Montgomery, Alabama, for
example, was ordered to appoint an EEO officer to remedy
longstanding discrimination against minority and female officers.
See generally, Jordan v. Wilson, 667 F. Supp. 772 (M.D. Ala.
1987).  We are not comparing the YPD to the Montgomery Police
Department, however we do recommend that the Department examine
the remedial measures in Jordan, and other cases like it, to
ensure that it is in compliance with federal anti-discrimination
laws.

***

Please note that this letter is a public document.  It will
be posted on the Civil Rights Division's website.  While we will
provide a copy of this letter to any individual or entity upon
request, as a matter of courtesy, we will not post the letter on
the Civil Rights Division's website until 10 calendar days from
the date of this letter.

- 40 -

Thank you for your cooperation and assistance with this investigation. We hope that these recommendations will be received in the spirit of assisting in our mutual goal of ensuring that the best possible law enforcement services are provided to the people who reside in and travel through Yonkers. We look forward to meeting with you and the staff at the YPD. Please feel free to contact us at the numbers listed below if you have any questions.

Sincerely,

LORETTA KING
ACTING ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION

By:/s/ Shanetta Y. Cutlar
Shanetta Y. Cutlar
Chief
Special Litigation Section
(202) 514-6255

LEV L. DASSIN
ACTING UNITED STATES ATTORNEY
FOR THE SOUTHERN DISTRICT
OF NEW YORK

By: /s/ David J. Kennedy
David J. Kennedy
Chief
Civil Rights Unit
(212) 637-2800

/s/ Zazy L. López
Tammie M. Gregg
Principal Deputy Chief
Zazy L. López
Regina M. Jansen
Trial Attorneys

/s/ Carolina A. Fornos
Carolina A. Fornos
Danna Drori
Assistant U.S. Attorneys

- 41 -

cc:  <u>By First Class Mail</u>

The Honorable Philip A. Amicone
Mayor
City of Yonkers, New York

The Honorable Chuck Lesnick
City Council President
City of Yonkers, New York

Edmund Hartnett
Police Commissioner
City of Yonkers New York Police Department

Frank J. Rubino
Corporate Counsel
City of Yonkers, New York Corporation Counsel

Paul Hart
Assistant Corporation Counsel
City of Yonkers, New York Corporation Counsel

Rory McCormick
Assistant Corporation Counsel
City of Yonkers, New York Corporation Counsel

David J. Kennedy
Chief, Civil Rights Unit
United States Department of Justice
Unites States Attorney
Southern District of New York